UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **DANIEL R. BOWMAN and** | ) | Case No. 17-33192-thf |
| **CONNIE R. BOWMAN** | ) | |
| | ) | Chapter 13 |
| Debtors | ) | |
| | ) | |
| **EDWIN BRIAN KORESSEL** | ) | Adv. No. 18-03002-thf |
| **and AGAPE CREMATION AND** | ) | |
| **FUNERAL CENTER, LLC** | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| **DANIEL R. BOWMAN** | ) | |
| | ) | |
| Defendant | ) | |

\* \* \* \* \*

## MEMORANDUM OPINION

This core proceeding comes before the Court upon the Complaint of Plaintiffs-Creditors, E. Brian Koressel ("Koressel") and Agape Funeral & Cremation Center, LLC ("Agape"), against the Defendant-Debtor, Daniel R. Bowman ("Bowman" or "Debtor"), for Determination of Dischargeability of Debt and Objection to Discharge Pursuant to 11 U.S.C. §§ 523 and 727. Plaintiffs seek an Order from the Court finding that Bowman's conduct surrounding a funeral home business venture with the Plaintiffs amounted to embezzlement, and as a result, Bowman should be denied a discharge as to the debts owed to Plaintiffs. The Court has jurisdiction over this adversary proceeding pursuant to Section 523 of the Bankruptcy Code and 28 U.S.C. § 1334. This case is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(J).

1

For reasons set forth below, the Court finds that Bowman's mismanagement of funds amounted to embezzlement, that Plaintiffs are entitled to judgment in the amount of $36,266.67, a sum which represents Brian Koressel's total contribution in the funeral home venture minus reimbursements and recoveries already received, and that this judgment is non-dischargeable under 11 U.S.C. § 523(a)(4).

## FACTUAL BACKGROUND

Beginning in September of 2015, Debtor Daniel Bowman and Plaintiff Brian Koressel formed an agreement with a third individual, Trent Hole ("Hole"), to start and operate a funeral home business called Agape Cremation and Funeral Center, LLC. Bowman and Hole already had experience in the funeral industry: Bowman worked at Schoppenhorst Funeral Home in Sheperdsville, Kentucky for nearly fifteen years prior, and Hole worked with Bowman at Schoppenhorst for about a year. Both were also licensed funeral directors in Kentucky. Bowman and Koressel brought Hole into the business in part because he already had access to an embalming room via his solely-owned company Neurath Trent, LLC, and was able to provide Agape with a "parent" funeral license. Bowman and Koressel looked at various locations for Agape's operations before settling on property at 4438 Dixie Highway in Louisville, Kentucky.

Pursuant to Agape's Operating Agreement (the "Agreement"), Koressel, Bowman and Hole (through his company called Neurath Trent, LLC) were the three sole members of Agape. Each member owned an equal one-third share and ownership interest in Agape, and all members were to receive equal quarterly distributions of any income received. Due to his background in the funeral home business and his status as licensed funeral director, Bowman was named Agape's manager. According to the Agreement, this made Bowman an "agent of the company"

and required him to "manage, direct, and control the general business and affairs of the company." The Agreement also expressly required each member's written consent for any Agape transactions above $5,500, and specifically required Koressel's co-signature or written consent for any transactions above $2,500.

Although each member agreed to an initial capital contribution of $25,000, neither Bowman nor Hole paid their contributions to Agape. Koressel did pay his initial $25,000 share, though, and lent $15,000 each to Bowman and Hole in November of 2015 as partial fulfillment of their contributions. Koressel therefore contributed $55,000 (his original $25,000 contribution, plus two $15,000 loans to Bowman and Hole) towards Agape's initial capital contribution. Much of this money went towards renovations for the Dixie Highway building at a cost of around $36,800,[1] which were performed by Venture Elite, the general contracting company owned by Koressel's wife. After the renovations, Agape had a remaining surplus of $11,200 in capital contribution money, and the members voted to equally distribute that money on February 29, 2016, which allowed Bowman and Hole to pay down their notes to Koressel in part. Having initially contributed $55,000 and being later reimbursed $11,200, Koressel's total out-of-pocket contribution to Agape was $43,800. Together, Bowman and Koressel established a bank account at Stock Yards Bank for Agape's funds and operations.

Agape opened for business on January 1, 2016, with Bowman as its managing member, and operated through approximately July 2017. Bowman controlled the company's day-to-day operations, kept all the company's records, and managed Agape's finances and Stock Yards

---

[1] Despite lengthy testimony at trial regarding whether Agape's startup and renovation costs exceeded initial estimates, the parties ultimately did not dispute that the final cost of the renovations – $36,800 – was reasonable. [R. 93 at 128, 141]; [R. 94 at 151].

3

account.  By April of 2016, however – just four months after Agape opened its doors – Hole and Bowman were scheduling meetings to discuss potentially dissolving Agape due to its financial struggles.

Meanwhile, the personal relationship between Bowman and Koressel rapidly deteriorated.  Bowman began to shut Koressel out of Agape's meetings and business decisions.  Bowman and Hole held numerous meetings without Koressel's knowledge or involvement, and throughout 2016 and 2017, Bowman relocated Agape's funds from Stock Yards Bank to other accounts at Commonwealth Bank, Your Community Bank, and WesBanco Bank.  These accounts were all owned by third parties such as Hole's Neurath Trent LLC, which had the effect of concealing transactions from Koressel.  Bowman transferred and comingled Agape funds with his Chase Card and personal accounts and used Agape funds for purchases such as car insurance for his personal car, gas for his wife's car, and his daughter's laptop and phone bill.  Bowman sold Agape his own personal vehicle, retained a lien on it, and then reclaimed personal ownership of the vehicle without authority.  Bowman also failed to pay Koressel the taxable income that Agape attributed to him.  Bowman wrote multiple checks for Agape transactions exceeding $2,500 without Koressel's required authorization.  Ultimately, Bowman made numerous distributions to Hole and to himself in excess of $75,000 but made no distributions to Koressel.

Bowman eventually shut off all communication with Koressel entirely, refusing to hold meetings or share financial data or any information whatsoever about Agape's operations with Koressel.  Even when Bowman and Hole were having meetings regarding Agape's potential dissolution or asset sale to another entity, Koressel was never informed of these discussions.

Koressel testified that he did not learn Agape had ceased operations until August of 2017, when he called Agape's phone number and another funeral home answered.

Frustrated by his sudden, unexplained exclusion from all Agape business decisions despite his significant financial contributions and one-third share in the business, Koressel filed suit against Bowman and Hole in Jefferson Circuit Court (Case No. l6-CI-3848) in September of 2016.  Koressel obtained a default judgment against Bowman for, *inter alia*, breaches of fiduciary duties to Koressel, and the state court awarded Bowman's one-third interest in Agape to Koressel.  Koressel also filed suit against Hole in U.S. bankruptcy court and was awarded a non-dischargeable judgment against Hole $189,169.19 in compensatory damages, $25,000 in punitive damages, and $14,605 in fees.[2]  Meanwhile, Hole sold his one-third share of Agape to a competing funeral home company called Woodlawn, diverted Agape's business there, stripped Agape of its funeral license in July of 2017, and allowed Agape to default on its lease around August of 2017, all unbeknownst to Koressel.  With no valid lease or location from which to operate, Agape became defunct and dissolved.

On September 30, 2017, Bowman filed a Chapter 13 petition for relief.  Koressel initiated this adversary proceeding on January 10, 2018.  Plaintiffs' complaint asserts claims of non-dischargeability under the following sections: under 11 U.S.C. § 523(a)(2)(A), alleging Bowman obtained money by fraud (Count I); under § 523(a)(4), alleging Bowman embezzled funds obtained in a fiduciary capacity (Count II); under § 523(a)(6), alleging Bowman caused willful and malicious injury to Plaintiffs (Count III); under § 727(A)(2), alleging Bowman transferred, removed or concealed debtor's property with intent to hinder delay or defraud creditors, and

---

[2] *See In re*: *Hole*, Case No. 17-32875(7), A.P. No. 18-03009.

failed to disclose accounts receivable (Count IV); under § 727(A)(3), alleging Bowman concealed, destroyed, falsified, or failed to preserve records from which both his and Agape's financial condition and business transactions might be ascertained (Count V); and under Section 727(A)(4), alleging Bowman knowingly and fraudulently made a false account, attempted to obtain money for acting or forbearing to act, or withheld any recorded information relating to debtor's property or financial affairs, including failure to disclose necessary information in his bankruptcy petition and schedules (Count VI).  This Court held a trial from June 24, 2019 through June 27, 2019.  The parties have submitted post-trial briefs, rendering this matter ripe for adjudication.

## **DISCUSSION**

Plaintiffs seek denial of a discharge to Defendant under 11 U.S.C. §§ 523(a) and 727(A). As a preliminary matter, the Court notes that, although the Debtor's underlying bankruptcy is a Chapter 13 case, both parties in this adversary proceeding labeled their filings as "Chapter 7," from the adversary complaint through the post-trial briefs.  Section 727 does not apply in Chapter 13 cases; 11 U.S.C. § 103 provides that subchapter II of Chapter 7 applies only in cases under Chapter 7.  *In re Bonder*, 3 B.R. 623, 625 (Bankr. E.D.N.Y. 1980).  For that reason, the Court limits its analysis to the arguments raised under § 523.

To succeed on a claim made under § 523(a), a plaintiff must prove by a preponderance of the evidence each element to support a determination that a debt is nondischargeable. *Merritt v. Layne (In re Layne)*, 517 B.R. 778, 781 (Bankr. E.D. Ky. 2014).  Courts construe exceptions to discharge narrowly and in the debtor's favor.  *HIJ Indus. v. Roy (In re Roy)*, 565 B.R. 820, 830 (Bankr. E.D. Ky. 2017) (citing *In re Zwosta*, 395 B.R. 378, 382–83 (BAP 6th Cir. 2008)).

6

Debts arising from embezzlement or larceny[3] are excepted from discharge in bankruptcy under 11 U.S.C. § 523(a)(4). That statute states in relevant part: "A discharge under section 727, 1141, 1192, 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . ." 11 U.S.C. § 523(a)(4). Federal common law determines the meaning of the terms in section 523(a)(4), including what constitutes "embezzlement" for nondischargeability purposes. *Smith v. Morse* (*In re Morse*), 535 B.R. 268, 280 (Bankr. E.D. Tenn. 2015); *see also SmithKline Beecham Corp. v. Lam* (*In re Lam*), 2008 WL 7842072 at *3 (Bankr. N.D. Ga. 2008) (citing *Kaye v. Rose* (*In re Rose*), 934 F.2d 901 (7th Cir. 1991); *In re Wallace*, 840 F.2d 762 (10th Cir. 1988)) (other citations omitted).

The Sixth Circuit has defined embezzlement, for purposes of section 523(a)(4), as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1172–73 (6th Cir. 1996) (citations omitted). A finding of embezzlement does not require the existence of a fiduciary relationship. *Bluegrass Stockyards of Campbellsville, LLC v. Smith (In re Smith)*, 429 B.R. 864, 871 (Bankr. W.D. Ky. 2010) (quoting *In re James*, 42 B.R. 265, 267 (Bankr. W.D. Ky. 1984)); *see also In re Brady*, 101 F.3d at 1165. A creditor can establish that a debt is non-dischargeable by proving three elements of embezzlement: "(1) 'that he entrusted his property to the debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) that 'the circumstances indicate fraud.'" *Cash Am. Fin. Servs.,*

---

[3] Embezzlement differs from larceny in that, with embezzlement, the original taking of the property was lawful or with the consent of the owner, whereas in larceny, the felonious intent existed at the time of the taking. Black's Law Dictionary (8th ed. 2004); *see Werner v. Hofmann*, 144 B.R. 459 (Bankr. D.N.D. 1992), *aff'd*, 5 F.3d 1170 (8th Cir. 1993).

7

*Inc. v. Fox (In re Fox)*, 370 B.R. 104, 115–16 (B.A.P. 6th Cir. 2007) (quoting *In re Brady*, 101 F.3d at 1173).

* * * * *

The Court will first address Counts IV, V, and VI of Plaintiffs' Complaint, requesting a denial of discharge under 11 U.S.C. §§ 727(A)(2), (A)(3), and (A)(4), respectively. As stated above, this is a Chapter 13 case, rendering Plaintiffs' § 727 arguments inapplicable. Accordingly, the Court turns to Count II, which alleges non-dischargeability under § 523(a)(4). The evidence presented at trial establishes that Bowman, as manager of Agape, embezzled funds from Agape and concealed Agape's financial and business records from Koressel without explanation or justification. The Court finds that Plaintiffs proved embezzlement by the Debtor, by showing through a preponderance of the evidence that Koressel entrusted property to Bowman, that Bowman appropriated the property for a use other than that for which it was entrusted, and the surrounding circumstances indicate fraud. *In re Brady*, 101 F.3d at 1172–73.

**A.   Plaintiff Entrusted Property to Debtor.**

Evidence at trial in the form of oral testimony and Agape's Operating Agreement established that Bowman persuaded Koressel to contribute $25,000 of his money into Agape. Soon thereafter, Koressel placed $30,000 of additional funds into Agape in what was meant to be a temporary, partial fulfillment of Bowman and Hole's $25,000 contribution obligations. Koressel contributed and lent this money to help start the company and to fund its operations. The express terms of the Agreement made Koressel an equal member and one-third owner of Agape and entitled him to a one-third share of any profit distribution. It remains undisputed that Bowman was the managing member of Agape, as well as one-third owner of the LLC, and that

8

the Agreement expressly required Bowman to obtain Koressel's co-signature or consent for any transactions above $2,500.

The Court finds that Bowman was entrusted with Agape's funds. The Operating Agreement made him the sole manager of Agape. As manager, he was an "agent of the company," required to "manage, direct, and control the general business and affairs of the company." The Agreement expressly imposed a standard of care on Bowman, requiring him to "perform all duties in good faith, in a manner [he] reasonably believe[d] to be in (and not opposed to) the company's best interests, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances." Bowman's power over the use of Agape's funds – 100% of which, at the company's inception, came from Koressel's contribution and loans – establish that Bowman was "entrusted" with those funds as required by the first element of embezzlement under § 523(a)(4). *See In re Spivey*, 2010 WL 3980132, at *12 (Bankr. E.D. Tenn. 2010) ("As managing member, the Defendant was clearly entrusted with [] LLC funds . . . [He] was charged with the sole power and authority to execute instruments on behalf of and legally bind the LLC.").

This finding is not inconsistent with cases holding that an "investment" of funds in an LLC is generally not enough to establish that the LLC owner was "entrusted" with those funds for § 523(a)(4) embezzlement purposes. *See, e.g. In re Boyd*, 2019 WL 948347, at *9 (Bankr. E.D. Tenn. 2019). Here, Koressel did not merely "invest" his property in Agape: he became a member and equal one-third owner who was entitled to one third of any profit distributions, while lacking the managerial and decision-making power that Bowman possessed. The Agreement's main structural protections of Koressel's interest in Agape were embedded in the

requirements that Koressel be included in meetings, kept abreast of business decisions, and be permitted to sign off on checks or transactions above a certain threshold amount. As discussed below, these are all protections that Bowman ignored and knowingly circumvented.

The Court notes that Section 523(a)(4) also provides for a denial of discharge for any debt arising from "fraud or defalcation while acting in a fiduciary capacity." Plaintiffs rely heavily on this provision throughout their briefs and arguments at trial, and this Court believes that the facts presented do involve a fiduciary capacity and a failure by the debtor to act in accordance with that capacity. In the Sixth Circuit, however, the "fiduciary capacity" provision of § 523(a)(4) has been construed very narrowly, requiring the existence of a "technical trust" under circumstances that are not met here. *In re Patel*, 565 F.3d 963, 968 (6th Cir. 2009). Regardless, Bowman was clearly entrusted with Agape's funds, and the first element of embezzlement under § 523(a)(4) is satisfied.

**B.     Debtor Misappropriated the Property Entrusted to Him as LLC Manager.**

The evidence and trial testimony clearly establish that Bowman "appropriate[d] the property for a use other than that for which it was entrusted." *In re Brady*, 101 F.3d at 1172-73. The entirety of Agape's initial startup funds came from Koressel alone, and yet Koressel never received any money back from Agape (aside from the partial repayment of the money he had loaned to Bowman and Hole), a fact which Bowman does not deny. Bowman made numerous distributions of Agape funds to himself and to Hole, but never to Koressel – even though the Operating Agreement required that any net income from Agape's operations be distributed equally in *pro rata* shares to Agape's three members.

For example, Bowman admitted at trial that, once Agape lost its funeral license, he moved Agape's remaining funds to his personal account and "lived on it," used them to pay for his personal living expenses, such as home expenses and mortgage payments. [R. 94 at 226 – 227]. Bowman admitted he paid Agape funds to himself, acknowledging among other things a transfer of $10,000 in Agape funds to his own personal bank account. The gasoline receipts through the first quarter of 2017 showed gas expenses of $2,510.48, even though the only driving needed by Agape involved occasionally picking up cremation remains a few miles away. The preponderance of evidence presented at trial establishes that Bowman used Agape's funds as something "to live on," [R. 95 at 116], paying for personal expenses such as car insurance for his vehicle, carpeting for his home, clothes, and his daughter's laptop and phone bill.

Bowman likewise made payments of Agape funds to Agape's third member, Trent Hole, making Koressel the only member who never received Agape funds. Agape's bank records show Hole received a total of $76,928.90 from Agape in 2016 and 2017, but Agape could only produce invoices totaling $8,614 for work performed by Hole. Although the records and testimony produced by Bowman fail to produce a clean accounting of how Agape's funds flowed in and out of the company, the totality of the evidence paints an overwhelming picture of Bowman using Agape's funds without Koressel's knowledge or approval as required by the Operating Agreement. Many of these payments went to Bowman for his personal expenses. Notably, despite Koressel's never receiving any quarterly distributions from Agape, Bowman admits that Agape's tax filings somehow showed that Koressel received a gross income of $35,524 from Agape in 2016. Bowman did not deny at trial that Koressel never received any

11

income from Agape and was unable to provide a satisfactory explanation for why this income was attributed to Koressel.

Further, Bowman entered into transactions above the $2,500 and $5,500 thresholds, requiring approval from the other LLC members under the Operating Agreement, without getting such approval from Koressel.  At trial, Bowman admitted to entering into at least one transaction without full authority or membership consent, when he paid a casket company an amount greater than the $2,500 threshold.  Bowman also wrote two separate checks for $2,500 to Hole, instead of a single check for $5,000, specifically to avoid the spirit of Operating Agreement's requirements that Koressel be kept in the loop.  Bowman admitted that the reason the checks were written for those amounts was so that he would not have to get Koressel's permission.

The evidence indicates Bowman also concealed his use of Agape's funds from Koressel by keeping, managing, and transacting Agape's funds in multiple separate bank accounts to which Koressel lacked access, instead of continuing to use the joint Stock Yards account set up by Bowman and Koressel.  For example, at trial Bowman admitted to transferring Agape moneys to a newly-opened Commonwealth account, and into a Your Community Bank account co-owned with Hole, in 2017.  Given that Koressel knew nothing about either account, Bowman engaged in significant misappropriation of Agape's funds by using them for personal transactions and moving them to other bank accounts without Koressel's knowledge.  Bowman purposefully kept Koressel from reviewing Agape's transactions and ignored the Operating Agreement's provisions to the contrary.  Bowman concealed Agape's finances from Koressel by switching bank accounts and refusing him access to the new ones.

In his managerial capacity, Bowman treated Agape's funds with a flagrant disregard of the standard of care imposed by the Operating Agreement and the duties owed to Agape's other members. Bowman admitted to diverting much of Agape's business and assets to Agape Cremation Group, Hole's separate parent company of which Koressel was not a member, and knowingly allowed Agape's lease to expire in order to place the company in default for the benefit other competing entities. Koressel said he would have happily paid this lease himself to keep the company open, had he known Agape was behind on payments. Koressel likewise testified that Bowman never discussed his decision to pay for major repairs to Agape's HVAC system, which the lease plainly required the landlord to cover, costing Agape over $3,000.

Perhaps Bowman's most egregious conduct involved a sale of his personal vehicle, a 2010 Dodge Journey, to Agape. Bowman sold the vehicle to Agape without Koressel's knowledge or authorization and was personally paid out of Agape's funds for the sale. Bowman himself estimated the car was worth around $6,200, but he sold it to Agape for $5,499. Bowman admits that this sale amount was used to circumvent the Operating Agreement's threshold amounts which would have required Koressel's approval, confirming that he chose that amount because he "didn't want [Koressel] involved in that transaction." [R. 94 at 117]. Later, Agape re-conveyed the car back to Bowman – for free. Not only does such a maneuver cast a serious shadow on the legitimacy of Bowman's actions in general, but it also constitutes a blatant theft of Agape's funds – once again, without the notice or approval of Koressel, one of Agape's core members and one-third owner.

These business decisions are exactly the kind that Koressel should have been kept abreast of, precisely so that he would have an opportunity to protect his ownership interest by objecting

13

to wasteful and irresponsible use of Agape funds. Instead, these decisions by Bowman occurred against the backdrop of his active concealment of Agape's finances and business transactions from Koressel, as well as his open desire to remove Koressel from the company completely. Eventually, Bowman attempted to dissolve the company altogether, and he admitted at trial that his motivation in doing so was to push Koressel out. Much like the embezzling debtor in *Brady*, Bowman "secretly took funds constituting part of creditor's individual share of the [] proceeds from an account held jointly by creditor and debtor and transferred those funds." *In re Brady* at 1173. The Court is convinced that Bowman's unauthorized and questionable use of Agape's funds constitute a misappropriation of Agape's funds for a use other than they that for which they were entrusted to them. The second element of embezzlement is met for purposes of § 523(a)(4).

C.   **The Surrounding Circumstances Indicate Fraud on Debtor's Part.**

The last element of a § 523(a)(4) embezzlement claim is whether the "circumstances indicate fraud." *In re Fox*, 370 B.R. at 115–16 (quoting *In re Brady*, 101 F.3d at 1173). The Sixth Circuit Bankruptcy Appellate Panel has described what type of fraud must be shown:

> The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude or intentional wrong." Accordingly, embezzlement claims under § 523(a)(4) require "proof of the debtor's fraudulent intent in taking the [creditor's] property." As the *Brady* definition suggests, the debtor's fraudulent intent may often be shown by circumstantial evidence.

*In re Fox*, 370 B.R. at 116 (internal quotations and citations omitted). The Panel further explained that "misrepresentations, omissions, or other concealment of a debtor's actions regarding a creditor's property are important circumstances that might pierce the shadows to illuminate a debtor's fraudulent intent." *Id*.

Thus, circumstantial evidence of a debtor's concealment of his use of entrusted property can establish fraudulent intent and satisfy the third element. "[I]t is not necessary for a creditor to prove that a debtor's misrepresentations induced it to part with property. Rather, the creditor needs only to prove misappropriation and 'circumstances indicating fraud,' such as circumstances suggesting that the debtor intended to conceal the misappropriation." *Bello Paradiso, LLC v. Hatch (In re Hatch)*, 465 B.R. 479, 487 (Bankr. W.D. Mich. 2012). This proceeding has produced ample evidence of Bowman's misrepresentations, omissions, and concealment of his use of Agape funds. Bowman moved Agape funds out of the Stock Yards bank account shortly after Agape began, rebuffed Koressel's requests for information about the use of the funds, and purposefully structured transactions so the dollar amounts would fall just below the threshold requiring Koressel's involvement. Bowman fraudulently concealed the use of Agape funds from Koressel.

Courts have ruled that managers of limited liability companies (LLCs) who misappropriate company property and conceal information about it from other company members have acted with fraudulent intent, thereby satisfying the third element of a § 523(a)(4) embezzlement claim. In *PMM Invs., LLC v. Campbell (In re Campbell)*, 490 B.R. 390, 403 (Bankr. D. Ariz. 2013), the debtor, who managed an LLC, was found liable to other members for embezzlement under § 523(a)(4). In discussing the "circumstances indicate fraud" element, the court noted the debtor in *Campbell* was aware of diversions of LLC funds, concealed information about it from other LLC members, and failed to provide financial information to other members after repeated requests. This "failure to comply with his duties as a Manager" led the court to determine that the circumstances indicated fraud and hold the debt non-

15

dischargeable for embezzlement under § 523(a)(4). Similarly, in *King v. Spivey (In re Spivey)*, 2010 WL 3980132, at *13 (Bankr. E.D. Tenn. 2010), the court found that the LLC manager acted fraudulently when he "misappropriated large sums of [] LLC funds, presumably for other projects and admittedly for his personal use, both without the authorization or knowledge of the Plaintiffs." *Id.* The *Spivey* court entered a non-dischargeable judgment against the debtor in favor of plaintiffs, two other members of the LLC, under § 523(a)(4) based on the misuse of the LLC's funds. *See also In re Pollard*, 2012 Bankr. LEXIS 481, at *10 (Bankr. N.D. Ohio 2012) (excepting from discharge under § 523(a)(4) a state court judgment involving LLC funds that were "never contributed to the operations or accounts of Plaintiff but retained by [the debtor-defendant, the LLC's manager] for his own uses and purposes" contrary to the LLC's operating agreement requirements).

Notably, in its determination of whether the circumstances of this case indicate fraud on the part of the debtor, this Court considers the credibility and character of the debtor. When analyzing circumstantial evidence of an intent to defraud under § 523(a)(4), the court "looks to the witness's credibility and the evidence presented." *In re Kakareko*, 575 B.R. 12, 28 (Bankr. E.D.N.Y. 2017); *see also Lukes v. Stover (In re Stover)*, 2012 WL 4867407, at *4 (Bankr. S.D. Ind. 2012). The Court notes at this juncture that, throughout the duration of his trial testimony, Bowman often meandered in his answers and was frequently non-responsive to simple yes-or-no questions, requiring the Court to admonish Bowman to give straightforward answers on at least one occasion. *See, e.g.*, [R. 95 at 24]. There was also testimony at trial pertaining to Bowman's potential Medicare fraud and his opting not to take a salary from Agape so as to preserve his Medicare benefits. The Court takes Bowman's recurring non-answers and overall demeanor into

16

consideration, and based on his obstinance and non-responsiveness to questions at trial, the Court did not find Bowman to be a credible witness.

Bowman's actions were devious and reflective of an intent to defraud Koressel out of his contribution and oust him from the business partnership for good. The circumstances indicate fraud, and the third element of embezzlement is satisfied. Based on the preponderance of the evidence, and the trial testimony and arguments presented by the parties, the Court finds the debt owed by Bowman to Plaintiffs to be non-dischargeable.

## DAMAGES

Finding that the Plaintiffs have prevailed under Count II of the Complaint, proving embezzlement under § 523(a)(4) by a preponderance of the evidence, the Court need not find an exception to discharge under the other § 523 theories Plaintiff asserts under Counts I or III. In Counts IV, V, and VI, Plaintiffs seek to have Debtor's discharge completely denied as to all debts, relying on 11 U.S.C. § 727(A)(2), (A)(3), and (A)(4), respectively. As explained above, those arguments are inapplicable in the underlying Chapter 13 case.

Koressel initially contributed $25,000 to Agape. He also lent Bowman and Hole $15,000 each to cover part of their contribution obligations, meaning Koressel put $55,000 into Agape at its inception. After $36,800 of that $55,000 was spent on renovations, Agape had a surplus of $11,200 remaining, which the three members voted to distribute in equal shares. Bowman and Hole both "gave" their one-third shares of this distribution to Koressel, and that $3,733.33 amount was credited against the $15,000 loans Koressel had extended to each of them, leaving both with a loan balance of $11,266.67 owed to Koressel. Because Koressel has already received a non-dischargeable judgment against Hole, who is not a named defendant in this suit,

17

the $11,266.67 Hole owed to Koressel will not be included in the recovery in this case to avoid double recovery. Koressel, therefore, is entitled to a judgment for $36,266.67 from Bowman, an amount that accounts for Koressel's initial $25,000 contribution plus the $11,266.67 that Bowman owed him on the loan.

To put Plaintiff Brian Koressel into the position he was in prior to his financial contribution in Agape, the Court will accordingly order that Bowman's $36,266.67 debt to Koressel is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4). The Court will issue a separate Order consistent with the provisions set forth in this Memorandum.

Thomas H. Fulton
United States Bankruptcy Judge

Dated: October 1, 2019